MEMORANDUM OF DECISION
The Commissioner of the Department of Children and Families (DCF) has brought these two petitions to terminate the parental fights of Ms. Rosa R. and Mr. Craig F., who are the biological parents of two minor children, nine-year-old Axavian (born September 1992) and seven-year-old Tiffany (born March 1994). There are no other actions pending regarding custody of these children. This court previously found that DCF had proven statutory grounds for terminating each respondent's parental fights under General Statutes § 17a-112 (j),[2] but reserved decision on disposition. The court adopts the factual findings of that earlier decision. The court now finds that terminating the parental rights of the respondents is in the best interest of both children. Accordingly, the court grants the petitions.
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes §§ 17a-112
(k). In re Tabitha P., 39 Conn. App. 353 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5.
1. Procedural Background
CT Page 14509
The court initially heard evidence in this case on September 11 through 13, 2000. On November 13, 2000, counsel for the minor child moved to open the trial and permit additional evidence as to the current status, placement and best interests of the children. The court granted that motion after argument and bifurcated the trial into separate adjudicatory and disposition phases. The court thereafter issued a written memorandum of decision finding that DCF had proven a statutory ground for terminating the parental rights of each parent. On September 28, 2001, the parties presented evidence in the dispositional phase of the hearing as to whether termination of the respondents' parental rights is in the best interests of either child. DCF presented testimony from Dr. Suzanne Marie Ciaramella, a licensed psychologist who supervised and then provided direct therapy for Axavian; Dr. Julia Ramos Grenier, who conducted court-ordered evaluations in this case; Ms. Nidia Diaz, an associate counselor at Connecticut Counseling Center (CCC), where she supervised the respondent mother's participation in a methadone maintenance program; and Ms. Kristen Birmingham, a drug and alcohol counselor licensed by the State of Connecticut who supervises the Ms. Diaz's work with the respondent mother at CCC.
The court has carefully considered the verified petition, all of the evidence, including the social study and other exhibits, and the testimony presented, according to the standards required by law.[3]
 2. Required Statutory Findings
The court makes the following findings required by General Statutes § 17a-112 (k) and has considered these factors and its findings in its determination of the best interests of the children. In re QuanitraM., 60 Conn. App. 96, ___ A.2d ___ (2000), cert. denied 255 Conn. 903,762 A.2d 909 (2000).
 a. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.
The court finds that DCF offered timely and appropriate services to the respondent mother to facilitate her reunion with Axavian and Tiffany. These included referrals to the Morris Foundation and Connecticut Counseling for drug evaluation and treatment to address her most serious problem, the abuse of illegal alcohol and drugs. DCF also referred her for individual counseling at Connecticut Counseling and for family parenting counseling at Family Ties to help her address her psychological problems and parenting skill deficits. DCF provided supervised visitations at Family Services and DCF for Ms. R. with her children to help her improve CT Page 14510 her parenting skills. DCF provided case management services to help her overcome the social needs that drug and alcohol had caused her, including referral to housing management companies to obtain suitable housing.
Although DCF offered no services to the respondent father to facilitate his reunion with these children, the court finds that it was reasonable and appropriate for DCF not to do so. He effectively abandoned these two children years ago. As he was incarcerated in New York State during the entire course of the neglect and termination proceedings, DCF could not offer him any services directly.
 b. Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
DCF made reasonable efforts to reunite the family. To reunify the children with their mother, DCF offered the services listed in the above paragraph. These were the services that would help the respondent mother, if she availed herself of them and successfully completed the programs offering them, to address and overcome the drug and alcohol addiction that led to DCF involvement in her family and removal of her children. The services provided to the mother were reasonably appropriate efforts to reunite mother and children. After the adjudicatory decision and reopening of evidence here, DCF again referred the mother for additional drug treatment. As for the respondent father, Mr. F., DCF could make no efforts to reunite the children with him other than pursue his suggested placement possibilities, his sister and his mother, both of which DCF took reasonable steps to investigate for placement. As Mr. F. was incarcerated, no other efforts by DCF to reunify Mr. F. with Axavian and Tiffany were reasonable or appropriate.
 c. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On May 18, 1998, the court issued the following expectations for Ms. R.:
(1) Keep all appointments set by or with DCF. Ms. R. missed one appointment for an intake with Family Services on June 9, 1998. As set forth in footnote four of the adjudicatory decision, although DCF claimed at trial that she had missed other appointments the court found no credible evidence that she did so.
(2) Keep whereabouts known to DCF. Ms. R. complied with this expectation. CT Page 14511
(3) Visit children as often as DCF permits. Ms. R. missed four visitation appointments in 1998, after which supervised visitations at Family Services were stopped. Since then she consistently visited her children until Natchaug Hospital suspended her visits last summer with Axavian.
(4) Participate in parenting counseling: Ms. R. missed an appointment for an intake at Family Services on June 9, 1998. Although DCF claimed at the adjudicatory trial that she had not gone to or completed parenting classes, the evidence she presented showed that she "successfully attended all scheduled classes" for problem-solving and "separation/reunification" on September 16, 1999, and December 16, 1999.
(5) Participate in individual counseling. Although Ms. R. initially was sporadic in attending individual counseling, the evidence shows that she consistently attended individual and group counseling sessions at Connecticut Counseling until discharged in August 2001 because of her recent relapses, lack of progress in overcoming her substance abuse problem, and not providing urine screens as requested.
(6) Participate in a drug/alcohol assessment and followingrecommendations. Before this year, Ms. R. had partially complied with this requirement before this year. She participated in the methadone maintenance treatment program offered by Connecticut Counseling from May 1999 until September 2001. This year, after considerable progress toward recovery from her substance abuse, she has again been using drugs and alcohol. Random urine tests at Connecticut Counseling showed use of morphine and opiates at intake, use of opiates on three occasions in 1999 and five times this year (on February 1, February 20, March 9, June 12, and June 29), and use of alcohol on October 26, 1999, June 22, 2000, and five times this year (on April 15, May 27, June 21, and July 6, 17, 22, and 23). Moreover, this year she refused to provide urine specimens for drug and alcohol screens four times in July and August. This court concurs with the assessment of Connecticut Counseling that such refusals show use of drugs or alcohol in violation of program rules. When the program staff there recommended this year that Ms. R. enter an inpatient drug treatment program to address her relapse and resumption of drug use this year, she refused to do so.
(7) Random drug screens: After entering the methadone maintenance program, she complied with the requirement of random drug screens until this year, when four times she refused to provide a urine specimen for such tests.
(8) No substance abuse. After early failure in efforts to curb substance abuse, Ms. R. was drug free from December 1999 until April CT Page 14512 2001. This year she relapsed, however, and used drugs or alcohol several times.
(9) Secure and maintain adequate housing and income. After a long period of unemployment, Ms. R. obtained full-time employment with a temporary agency early this in 2000 year and maintained that employment through the date of the adjudicatory hearing. At the time of that hearing, she was living rent-free in a room in an apartment belonging to an elderly male family friend. It was adequate but not suitable for her children. At the dispositional hearing, there was no evidence as to her current income and housing.
(10) No involvement with the criminal justice system. Ms. R. was arrested for criminal trespass in the first degree from December 12, 1998, and incarcerated on a pretrial basis until January 27, 1999, when she entered a guilty plea. She was sentenced to a term of one year, executive suspended, three years probation on that date.
(11) Sign releases for DCF and the court. Ms. R. did so.
 d. Finding regarding the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Axavian loves his mother, cares about her, and wants to maintain contact with her. He views her as his psychological parent, but only in an idealized sense as the parent he wishes she were. Tiffany has lived in her current foster placement for a considerable period and has close ties with her foster mother. She too, however, remains emotionally attached to her biological mother.
e. Findings regarding the age of the children
Axavian was born on September 1992, and is now nine years old. Tiffany was born on March 1994, and is now seven years old.
 f. Finding regarding the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with theCT Page 14513 guardian or other custodian of the child.
Ms. Rosa R., the biological mother, initially made significant progress toward recovery from her substance abuse program. By entering the methadone maintenance program and, for the most part, refraining from drug or alcohol use between May 1999 and the spring of this year, she was making steady progress toward making reunification in the best interest of her children. The resumption of drug and alcohol use this year will require her to begin that process of recovery again. She has maintained regular contact with both DCF and (until visits with Axavian were ended this summer) with her children although never asking for additional or more frequent visitation with her children. Yet her failure to recover from substance abuse, her recent relapse, and the continuing likelihood of relapse, coupled with her continuing psychological problems, inability to manage her children, limited role in their life, and the need of both Tiffany and Axavian for permanency and stability now all lead to the conclusion that the best interests of each child lay in the termination of her parental rights and their permanent placement elsewhere.
The father, Craig F., has made no effort to adjust his conduct circumstances or conditions to make it in the best interests of the children to be returned to his home in the foreseeable future.
 g. Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
No unreasonable act or conduct of any person has prevented either parent from having a meaningful relationship with either child. Nor has the economic circumstances of either parent limited such a relationship. The substance abuse of the respondent mother and criminal behavior of the respondent father resulted in the present situation. DCF has taken all reasonable steps appropriate to help Ms. R. maintain her relationship with her children. Mr. F. has been incarcerated since 1994 and will remain in prison until near the end of this year because of the choice he made to engage in illegal conduct. Mr. F's incarceration has obviously been a barrier to his having a meaningful relationship. On the other hand, he did not utilize any of the limited opportunities available to prisoners to initiate any contact or maintain a relationship with his children. He had made no efforts to maintain contact with his children in an effort to reunite with them.
3. The possibility of placement with paternal relatives
CT Page 14514
The children's father, Mr. F., has asked DCF and this court to consider placing Axavian and Tiffany with his sister or mother, both of whom live in Florida. Although doing so would allow Mr. F. the prospect of one day building parental ties with Axavian and Tiffany, during the adjudicatory or dispositional hearings, there was not sufficient evidence before the court to establish that it would be in the best interests of the children to be placed with either of these relatives. The DCF social worker testified that a Florida interstate compact study had found the sister inappropriate for placement. The most recent evidence about the grandmother's home, introduced at the adjudicatory hearing, was that it was not suitable for the children because it was too small. While perhaps she could rectify that problem, the respondent father presented no information on her willingness or ability to do so.
According to Mr. F.'s testimony, his mother had contact with Axavian when the child was young, but has not seen him since Mr. F. was incarcerated in 1993. Thus she made no effort on her own to see Axavian. She has never even met her granddaughter, Tiffany. While she may, as Mr. F. testified, have pictures of both children in her home, that hardly shows any connectedness with them. She never made any contacts with DCF during the pendency of the neglect or termination proceedings. While she may be a fine person, there is no evidence before the court to show that it would be in the children's best interests to be placed with her.
4. Best Interests of the Children
From the evidence offered at trial, the court finds, for the reasons stated below, that the best interest of each child requires termination of the parental rights of Ms. R. and Mr. F.
a. Axavian
As noted in the adjudicatory decision, Axavian has had a difficult life and has many special needs. He has exhibited behavioral problems at home and school. Those behavioral problems have disrupted nine foster placements. The testimony shows that he would do well in a foster home until he exploded and had to be removed. He is difficult to parent and needs lots of structure. The DCF worker testified that it had been difficult to find a foster placement that met his needs.
At the time of the original hearing a year ago, Axavian had begun to show significant improvement. His foster mother appeared to be providing the structure that this troubled child needs. Although his behavior at school was still occasionally out of control, in the foster home he had become comfortable and calm, was listening to others and being obedient to his foster parents. The testimony of Dr. Ramos Grenier at the CT Page 14515 adjudicatory hearing, however, portrayed Axavian's newfound success and stability as quite fragile. She testified that he could do well if he has a good sense of whom he can rely on among adult caretakers, but that if he feels threatened in that sense, he can become stressed and emotional or behavioral problems will ensue. Shortly after the end of evidence in the adjudicatory phase of this hearing, that analysis proved prescient, as Axavian again began acting out. He was removed from his foster home and placed in another. Early this year, shortly after a visit with his mother, he began exhibiting such self-injurious behavior as attempting to ran into the street to be hit by a car and tying pieces of carpet around his neck; he was "out of control, very defiant and oppositional." (Testimony of Dr. Suzanne Ciaramella, 9/28/2001, at page three.) On February 2001, DCF placed him at Natchaug Hospital, a psychiatric hospital for adolescents and adults, where he has remained until the present,
Upon his admission to Natchaug, the clinical staff there diagnosed his behavior as falling under four different psychiatric rubrics: post-traumatic stress disorder, reactive attachment disorder, attention deficit hyperactivity disorder (ADHD), and depressive disorder NOS. The post-traumatic stress disorder is a diagnosis used for a child with a history of abuse and neglect who thereafter shows certain behaviors; for Axavian, these have included nightmares, bed-wetting, difficulty concentrating, flashbacks and having difficulty relating to others. The label of depressive disorder NOS, "more of a non-specific diagnosis for depression;" id. at 18; was given because of vegetative symptoms on his part after admission to Natchaug: poor sleep; and acting withdrawn, isolative, and extremely angry. The ADHD diagnosis pertained to his difficulty concentrating and being hyperactive. The reactive attachment disorder described his "oppositionality, his aggression, [and] his difficulty connecting to . . . and trusting others." Id. at 19.
At the dispositional hearing, DCF called as a witness Dr. Suzanne Maria Ciaramella, a clinical psychologist who supervised Axavian's therapy at Natchaug until she became his direct therapist. She described reactive attachment disorder as a diagnosis used when a child has a history of having been neglected or abused and consequentially becomes unable "to maintain intimacy or closeness in a relationship due to the fact that they anticipate that relationship to be hurtful or harmful." Id. She said that because Axavian has been neglected in the past, he anticipates abuse and neglect from other potential care givers. As a result, he acts out, and this behavior then poisons the relationship with that potential care giver. As Dr. Ciaramella explained, in testimony the court found credible, Axavian has a "disrupted attachment, . . . thinking. that if my mother can't take care of me, and she's supposed to be the ultimate person who protects me and keeps me safe, then how can I trust somebody CT Page 14516 else to do so." Id. at eight.
After stabilizing Axavian so that he was no longer an immediate threat to himself, Natchaug began trying to address his underlying problems. The staff, however, found that after visits with his mother his behavior would deteriorate. Although the staff instructed her not to mention the possibility of his returning to her care, on at least one occasion she did so. Afterward he "became increasingly out of control, defiant, aggressive, detached and withdrawn." Id. at six. When DCF introduced him to a prospective adoptive parent while he was at Natchaug, he liked and initially got along with that person. After a visit with his mother, however, he physically assaulted that person. Concluding that visits with his mother exacerbated Axavian's problems and caused him to escalate his behaviors, in July the hospital, "for therapeutic reasons" discontinued her visits with him. Id. at six. After that, his behavior improved markedly.
 He has become more engaging . . . less withdrawn and less isolative. He's actually making friends for the first time, very much involved in his schoolwork, earning privileges on the unit, actually earning extra time with staff to play basketball and do the things he really loves to do.
(Testimony of Dr. Ciaramella; id. at seven.)
Both Dr. Ramos Grenier, who testified both at the adjudicatory and dispositional hearings here, and Dr. Ciaramella testified that Axavian still loves and is attached to his mother. In the words of Dr. Ciaramella, he has become parentified, in that "The child has become, now, one who is to care for the parent rather than the parent care for the child. It's very typical to occur in families where substance abuse is an issue." Id. at ten. But the mother's continuing involvement in his life is preventing him from overcoming many of his problems. The court finds the testimony and conclusions of Dr. Ciaramella on this point to be credible and well-founded. She explained that "[e]very time that he sees his mother, and she indicates that she's working hard to get him back or that he can come home, and it doesn't happen, his anger becomes fueled." Id. at nine.
A child such as Axavian, who has a reactive attachment disorder, needs a consistent, reliable and sober caretaker. Dr. Ciaramella explained, in testimony the court found credible and persuasive, that
 the only thing that helps a child who has a disordered attachment is consistent, reliable, stable parenting, CT Page 14517 or any kid of supportive relatiohship. . . . [T]hat means providing him with a stable, consistent, reliable family that can provide him with the nurturing and protection he needs so that when he does challenge them . . . and they know what he needs, and they can be there for him, it's going to hep him in the long run.
Id. at eleven.
Although his mother made good progress toward recovering from her substance abuse problem before the first hearing, since then she has relapsed repeatedly. Relapse is common among those seeking to recover from addiction. As Dr. Ramos Grenier pointed out, Ms. R. would need to have been sober and drug-free for at least a year before her recovery could be regarded as stable. In fact, the evidence showed that Ms. R. was drug-free for more than fifteen months, from near the end of 1999 through April of this year, and then relapsed again. Ms. R. is not yet ready, as her recent relapses require her to begin anew the arduous and difficult task of recovery. More relapses are possible, even likely.
The evidence made clear that Axavian still loves his mother. Dr. Ramos Grenier testified, and the court finds her credible, that Axavian would be likely to experience more serious emotional damage if he were reunited with her and again removed from her care. Any return to her now would necessarily be for an uncertain period of time, given her recent relapses and the likelihood of future relapses. The court finds Dr. Ramos Grenier's testimony credible that if Axavian were returned home to his mother now, or in the foreseeable future, it is likely that his behavioral difficulties would again erupt. Even during the two short parent/child interactions that Dr. Ramos Grenier conducted before the adjudicatory, Axavian's behavior degenerated during the session. In the first interaction, he got into a wrestling match with his older brother and both sons disregarded Ms. R.'s instructions to stop roughhousing. In the second interaction, Axavian and Tiffany "[t]oward the end of the evaluation . . . began to become rough with each other, and became less compliant with Mother's requests and instructions . . . Axavian pulled on Tiffany's shirt." This rough physical play echoes what happened in his foster home after a July 1, 1999, visit with his mother. According to the foster mother, as relayed by the Children in Placement Monitor, Axavian "returned from the visit in a very "angry' and "moody' manner. [He] was confrontational and trying to inflict physical pain on himself. . . ." (Petitioner's Exhibit 13, CIP Monitor Report, page 2.)
In view of his age and individual needs, Axavian needs the security and stability of a permanent placement in a safe, nurturing environment. The CT Page 14518 court finds the testimony of Dr. Ramos Grenier and Dr. Ciaramella credible that this young man, given his age, history and needs, needs permanency now, needs to stop worrying about being moved so that he can concentrate on becoming part of a new family. Similarly, the court believes the testimony of Dr. Ciaramella and the DCF social worker that not knowing where he is going to be and what his future holds contributes to his being out of control. "In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment."Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985).
Although Dr. Ramos Grenier reported that Axavian regards Ms. R. as his "psychological parent," a term used to convey the person to whom a child looks, "on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, [to fulfill] the child's psychological needs, as well as the child's physical needs"; Joseph Goldstein, et al., Beyond the Best Interests of the Child 99 (1979). The court concurs with her analysis that he sees Ms. R. as his psychological parent only in an "idealized" sense, as the parent he would like his mother to be rather than as she truly is. In no true sense does Ms. R. today fulfill the role of a psychological parent as someone Axavian can and does look to for ongoing physical and psychological protection, nurture, and sustenance. "[A] child may become deeply attached to a parent who is seriously inadequate, disturbed, or abusive, so that in some cases it is a disadvantage for the child to be in the care of the psychological parent. While psychological parenting is thus one indicator of the best interests of a child, a court has an independent responsibility to assure itself of the suitability of the parent to whom the child is primarily attached." (Internal citations omitted.) Seymourv. Seymour, 180 Conn. 705, 711-712, 433 A.2d 1005 (1980). Though the love between Axavian and Ms. R. as parent and child has endured, this court finds that it is in Axavian's best interests to terminate the parental rights of Ms. R.
According to Mr. F., when Axavian was young he did have a relationship with his father. Even if true, however, he has had none for seven years. Neither child has any bond with Mr. F. Beginning to develop a relationship with their father now, or waiting until his release from incarceration, would delay the permanence that each child needs now. As Dr. Ramos Grenier testified, since these two children need stability now, it is not in the best interest of either to wait until his release for permanency. Moreover, neither the court nor DCF has enough information on his capacity to be a good parent to say it would ever be in the best interests of either to be with Mr. F. The court accepts Dr. Ramos Grenier's testimony that it is not in Axavian's best interests to CT Page 14519 wait until Mr. F.'s suitability as a parent is known.
The court therefore finds that it is the best interests of Axavian for the parental rights of Ms. Rosa R. and Mr. Craig F. to be terminated.
b. Tiffany
Unlike her brother, Tiffany does not have special needs. By all accounts, she is a relatively normal, well-adjusted, easy-to-parent child. Although she is doing very well in her current foster placement and regards her foster mother as her psychological parent, adoption is not a possibility there. Like her brother, Tiffany needs a stable, permanent relationship with her adult caretakers, features that the inherent impermanency of foster placement does not provide. Thus, DCF will have to move Tiffany somewhere for permanency placement even if the court terminates the parental rights of Ms. R. and Mr. F. Dr. Ramos Grenier testified that a move to a new family would be difficult initially for Tiffany because she would experience a sense of loss from the end of her relationship with her current foster family. Yet, in view of the uncertainty of her mother's recovery and the lengthy delay before any such recovery can be regarded as stable, waiting any longer for her mother would be even more detrimental to Tiffany. Similarly, it is not in her best interest to wait for Mr. F.'s release from prison to determine whether he can be a suitable parent who would meet her needs.
The court finds the testimony of Dr. Ramos Grenier credible that Tiffany cannot wait any longer, for her mother to become a suitable parent. Ms. R.'s relapse shows that she will need a significant amount of more time for recovery before she could provide adequate parental care. Tiffany was first removed from her mother's care when she was only 15 1/2 months old. She has spent less than one-quarter (twenty months) of her entire young life living with her mother. Although she is emotionally attached to her mother and has said she would like to resume living with Ms. R., she no longer views her mother as her primary caretaker or psychological parent. In view of the unpredictability of Ms. R.'s recovery from substance abuse, her recent relapse, her apparent denial of an alcohol abuse problem, and the many other factors discussed herein, the court concludes that termination of the parental rights of her mother is in her best interest.
Fortunately, Tiffany has shown no serious psychological or behavioral problems. As seven-year-old child, however, she strongly needs a stable, permanent placement in a healthy, nurturing family environment. Dr. Ramos Grenier opined that Tiffany could begin to develop serious emotional difficulties if hopes of reunification with her mother were raised again and then dashed. That risk is not one the court believes would be in her CT Page 14520 best interests to take.
In closing argument at the adjudicatory hearing, counsel for Ms. R. acknowledged that "this family has been destroyed by drugs." The evidence confirms that drug and alcohol abuse has been the predominant problem preventing Ms. R. from being a suitable parent from the first DCF contact with her in 1995 through the date of dispositional hearing in October 2001. DCF provided many appropriate and reasonable services to Ms. R. to help her overcome her various problems. Recovery from drug and alcohol abuse, as Dr. Ramos Grenier testified, is a life-long process. Relapse is not unusual. In Ms. R.'s case, she has already relapsed again this year. Axavian and Tiffany were first removed from her six and one-half years ago. On July 21, 1995, the court first ordered her to avoid substance abuse and to seek drug and alcohol evaluation and follow treatment recommendations. DCF had to remove both children from their mother's care twice, and once from the maternal grandmother's care.
Despite the mother's efforts to address her addiction, and the obvious affection between her and her two children, Axavian and Tiffany need stable, permanent homes now, with families they can count on to provide the nurture, sustenance and guidance they need to become well-adjusted, productive members of society. They cannot afford to wait any longer, either for their mother to become stable in her recovery from substance abuse or for their father, who has never played any role in their lives, to be released from incarceration and demonstrate his parenting potential. Giving more time to either parent is not in either child's best interests.
The court has considered the request of counsel for the minor children not to terminate the respondent mother's parental rights as to Tiffany but instead allow the respondent mother to remain available to Tiffany as a visiting resource. Counsel for the minor child argued that doing so would help Tiffany avoid the double loss of her mother and the current foster family. The consulting psychologist, Axavian's therapist, and the guardian ad litem for the minor children, however, all recommend termination and permanent placement. Taking into consideration all the evidence, the court finds, by clear and convincing evidence, that Tiffany and Axavian both need permanency and stability now.
Accordingly, this court finds by clear and convincing evidence that it is in the best interests of Tiffany and Axavian to terminate the parental rights of Mr. Craig F. and Ms. Rosa R. to both children.
5. Orders of Termination
The court, having considered all the statutory criteria and having CT Page 14521 found by clear and convincing evidence that grounds exist to terminate each respondent's parental rights and having determined by clear and convincing evidence, upon all of the facts and circumstances presented, that it is in each child's best interest to terminate the parental tights of each respondent parent, accordingly, in accordance with General Statutes § 17a-112 (k), ORDERS:
The court hereby terminates the parental rights of Rosa R. and Craig F. as to Axavian and Tiffany.
The court appoints the Commissioner of the Department of Children and Families as the statutory parent of each child for the purpose of securing an adoptive family or other permanent placement for them.
Within thirty days of this judgment, the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION
[2] Section 17a-112 (j) of the General Statutes provides as follows: "The Superior Court, upon hearing and notice as provided in sections45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a heating pursuant to subsection (b) of section 17a-110 or section17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent CT Page 14522 could assume a responsible position in the life of the child; . . ."
[3] It is axiomatic that "`[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' Kimberly-Clark Corp. v. Dubno,204 Conn. 137, 153, 527 A.2d 679 (1987)." Jacques All Trades Corporationv. Brown, 42 Conn. App. 124, 129, 679 A.2d 27 (1996); see also In reHector L., 53 Conn. App. 359, 366, 730 A.2d 106 (1999). "It is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert." (Citation Omitted.) Tartaglino v. Dept. of Correction,55 Conn. App. 190, 195, 737 A.2d 993, cert. denied, 251 Conn. 929,742 A.2d 364 (1999).